**STATE OF HAWAI'I**, Plaintiff–Appellee, v. **NAOTO MATSUDA**, Defendant–Appellant

NO. 15613

(CR. NO. 90–1569)

SEPTEMBER 16, 1992

BURNS, C.J., HEEN, AND WATANABE, JJ.

*Per Curiam.* A jury found defendant Naoto Matsuda (Defendant) guilty of driving under the influence of intoxicating liquor (DUI) in violation of Hawai'i Revised Statutes § 291-4(a) (1985). On appeal, Defendant contends that the trial court erred in admitting his breath test result into evidence because the State of Hawai'i (State) failed to adequately show that the particular intoxilyzer model 4011AS (Intoxilyzer), the breath testing instrument that was utilized, was operating accurately.[1] We disagree and affirm.

## I.

After Defendant was arrested for DUI on May 9, 1990, and transported to the police station, he consented to take a breath test. Honolulu Police Department (HPD) police officer Brian Cayetano (Cayetano) administered the breath test on Defendant on Intoxilyzer No. 102374. Prior to testing Defendant's breath, Cayetano conducted an accuracy verification test of Intoxilyzer No. 102374

---

[1] *State v. Grindles*, 70 Haw. 528, 531, 777 P.2d 1187, 1190 (1989), held that Hawai'i Revised Statutes (HRS) § 291-4(a)(1) and -4(a)(2) (1985) are "two alternative means of proving the single offense of driving while under the influence of intoxicating liquor[,]" and do not constitute separate offenses. The State of Hawai'i, however, charged defendant Naoto Matsuda (Defendant) in Count I with a violation of HRS § 291-4(a)(1) (driving while under the influence of intoxicating liquor) and in Count II with a violation of HRS § 291-4(a)(2) (driving with a blood alcohol concentration of 0.10 percent or more). The jury found Defendant guilty of both counts. Defendant did not appeal the conviction under Count I. However, with respect to Count I, the trial court instructed the jury, *inter alia*, that "[n]o measurement of the defendant's blood alcohol content is necessary under Count I, although you may consider any measurement of defendant's blood content in determining whether defendant was under the influence." Because the jury may have considered Defendant's breath test result in its finding of guilty under Count I, we are compelled to consider and decide this appeal relating to the admission of the breath test result.

with a beam attenuator attached to it by a string. At trial, Cayetano testified that the beam attenuator had a "target value or expected reading" of 0.213 percent with a margin of error of $\pm 0.01$ percent. With the beam attenuator, Cayetano obtained a reading of 0.210 percent. Cayetano also testified that the beam attenuator had a serial number, but he did not record such number. The test result indicated a blood alcohol concentration (BAC) of 0.14 percent.

HPD evidence specialist John Wadahara (Wadahara) testified that he was a certified Intoxilyzer supervisor at the time in question. Wadahara testified that on May 3 and 31, 1990, he tested Intoxilyzer No. 102374 for accuracy with simulator solutions of 0.05 percent and 0.30 percent alcohol concentration and with the instrument's beam attenuator with the expected reading of 0.213. On May 3, 1990, Wadahara obtained readings of 0.04 percent and 0.29 percent with the simulator solutions, and 0.213 with the beam attenuator. On May 31, 1990, he obtained readings of 0.05 percent and 0.29 percent with the simulator solutions, and 0.212 with the beam attenuator.

The trial court admitted the Intoxilyzer No. 102374 test result of Defendant's breath into evidence over Defendant's objections.

A purpose of the Rules for the Testing of Blood, Breath and Other Bodily Substances for Alcohol Concentration (Rules) promulgated by the State's expert, the Department of Health, is to assure "proper 'scientific and technical' procedures in the testing for blood alcohol concentration[.]" *State v. Souza*, 6 Haw. App. 554, 560, 732 P.2d 253, 258 (1987). Consequently, we have held that "in meeting the foundational prerequisites for the admission of the Intoxilyzer test result there must be a showing of strict compliance with those provisions of the Rules which have a direct bearing on the validity and accuracy of the test result." *Id.* at 559, 732 P.2d at 257 (footnote omitted). Defendant asserts that, since strict compliance with certain provisions of the Rules was lacking in this case, the trial court reversibly erred in admitting Defendant's breath test result. Defendant's assertion is without merit.

## II.

Section 11–111–2.1(l) of the Rules requires that "[a]n accuracy verification test shall be performed during the actual breath test sequence of a subject." The supreme court has ruled that this accuracy verification test may be performed with an "accessory, denominated a Beam Attenuator by the manufacturer[.]" *State v. Christie*, 70 Haw. 158, 164, 766 P.2d 1198, 1201 (1988), *cert. denied*, 490 U.S. 1067, 109 S. Ct. 2068, 104 L. Ed. 2d 633 (1989).

A beam attenuator is described as follows:

> [It] is a circular piece of quartz encased in a rectangular metal holder; the quartz absorbs a known quantity of the infrared radiation emitted by the Intoxilyzer's light source when the accessory is placed in the instrument. *Each Beam Attenuator is matched to a particular Intoxilyzer*, and the "Certificate of Calibration Verification" supplied by the manufacturer advises the user of the reading that is displayed digitally to verify accuracy when the Beam Attenuator is employed as the testing standard.

*Christie*, 70 Haw. at 164, 766 P.2d at 1201–1202 (emphasis added) (footnote omitted). Each beam attenuator bears the same serial number as the Intoxilyzer to which it is matched.

Defendant states that the trial court failed to require the State to establish that the serial number of the beam attenuator matched that of Intoxilyzer No. 102374. Defendant argues that "[a]nything less would violate the standard of strict compliance."

The Rules, however, do not include any matching requirement. In fact, the Rules do not mention the term "beam attenuator" at all. As the supreme court observed, "beam attenuator" is not a generic term, but "a trade name bestowed on a particular accessory by the manufacturer of a breath testing instrument[.]" *Christie*, 70 Haw. at 170, 766 P.2d at 1205. Consequently, there is no matching provision in the Rules requiring strict compliance.

The issue is, notwithstanding the absence of the beam attenuator's serial number, whether there is sufficient evidence in the record to support the trial court's finding that the beam attenuator used by Cayetano was the matching beam attenuator for Intoxilyzer No. 102374. We conclude that there is.

The evidence clearly established that the beam attenuator Cayetano used was attached to Intoxilyzer No. 102374 with a string. The beam attenuator had a "target value or expected reading" of 0.213 ± 0.01 percent BAC. When Wadahara tested Intoxilyzer No. 102374 for accuracy on May 3 and 31, 1990, he used the "instrument's" beam attenuator with an expected reading of 0.213.

Based on the foregoing evidence, the trial court's implicit finding that the beam attenuator used by Cayetano was the matching one for Intoxilyzer No. 102374 was not clearly erroneous.

### III.

Section 11–111–2.1(j)(2) of the Rules requires calibration testing of breath testing instruments "not less frequently than every thirty days[.]" Section 11–111–2.1(k) of the Rules provides as follows:

> (k) The recommended calibration testing method shall use a minimum of two reference samples of known alcohol concentration at a known temperature within the range of one hundredths to thirty hundredths per cent weight per volume or higher known alcohol concentrations that are recommended by the breath testing instrument's manufacturer. The results of the analysis shall agree with the reference sample value within the limits of plus or minus one hundredths per cent weight per volume or such limits set by the director.

Wadahara testified that he tested Intoxilyzer No. 102374 on May 3 and 31, 1990 with sample solutions of 0.05 percent and 0.30 percent alcohol concentration and obtained readings of 0.04 per-

cent and 0.29 percent on May 3, 1990, and readings of 0.05 percent and 0.29 percent on May 31, 1990.

Defendant argues that, because section 11–111–2.1(k) of the Rules provides for a margin of error of ± 0.01 percent, Wadahara should have expressed the alcohol concentrations of the sample solutions and the calibration testing results of Intoxilyzer No. 102374 with three digits instead of two. Defendant states, for example, "if the original solution prepared by Mr. Wadahara was .059, and the reading during the calibration test resulted in a .041, there would be a difference of .018; a figure clearly beyond the allowable .01 margin of error."[2] Therefore Defendant asserts that the trial court clearly erred in concluding that strict compliance with the Rules "only requires a two–digit figure for the calibration testing method."

We have stated that the Department of Health is the "State's expert" regarding the procedures in the testing for blood alcohol concentration. *Souza*, 6 Haw. App. at 560, 732 P.2d at 258. Consequently, we will strictly apply the Rules promulgated by the State's expert.

Section 11–111–2.11(k) of the Rules requires the use of two reference samples of known alcohol concentration "within the range of one hundredths to thirty hundredths per cent[.]" Hundredths indicate two digits after a decimal point. If three digits are required as Defendant argues, section 11–111–2.1(k) would have used the word "thousandths" instead of "hundredths."

It is true that section 11–111–2.1(a)(2) of the Rules refers to "0.005 per cent weight per volume" and "0.0042 per cent weight per volume." However, sub–subsection (2) is preceded by an

---

[2] It is highly improbable for a reference sample of 0.05 percent alcohol concentration to be of 0.059 percent alcohol concentration as set forth in Defendant's hypothetical. When an intoxilyzer supervisor prepares a reference sample of 0.05 percent alcohol solution for calibration testing purpose, the reference sample would most probably be of 0.050 percent alcohol concentration.

introductory sentence in section 11–111–2.1(a) which states, "For the purposes of this approval [of breath testing instruments by the Department of Health] *only*, these devices and their related accessories shall comply with the following requirements[.]" (Emphasis added.) Our review of section 11–111–2.1 of the Rules relating to "breath testing instruments" indicates that, other than in subsection (a), the subsections use the term "hundredths," indicating two digits after a decimal point.

The trial court did not err in ruling that the Rules only require a two–digit figure for calibration testing of an Intoxilyzer.

Affirmed.

*Paul J. Cunney* on the brief for defendant–appellant.

*James M. Anderson*, Deputy Prosecuting Attorney, on the brief for plaintiff–appellee.